IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LAURETTE BROWN,

                        Plaintiff,                          OPINION AND ORDER

         v.                                                 18-cv-769-wmc

WI DEPT. OF TRANSPORTATION,

                        Defendant.

     *Pro se* plaintiff Laurette Brown was employed by the Wisconsin Department of Transportation ("DOT") from 2008 to 2017, at which point her employment ended. Brown then sued the DOT, contending that she was discriminated against because of her age, disability and race, and the court granted her leave to proceed under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), the Americans with Disabilities Act, 42 U.S.C. § 12112(a), and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2(a)(1). The court also granted her leave to proceed on retaliation claims under those same statutes based on her allegation that she was terminated only after she complained about discrimination.

     The DOT has moved for summary judgment. (Dkt. #16.)[1] It correctly points out that it is not subject to suit under the ADA or ADEA, and the evidence of record establishes that Brown is not entitled to relief alternatively under the Rehabilitation Act because she was not a qualified individual with a disability at the time of her termination, and her

---

[1] Brown responded to the DOT's motion by filing a document entitled motion for summary judgment. (Dkt. #27.) Although Brown did not follow the court's summary judgment procedures, Brown did respond to defendant's motion in substance. Given her *pro se* status, therefore, the court will treat that submission as her opposition, but for the reasons explained below, will not and need not address her own, inadequately supported motion for summary judgment further in this opinion.

employment presented an undue burden to the DOT.  Brown's Title VII claim fails as a matter of law because there is no dispute that Brown's inability to perform the necessary functions of her job was the cause of her termination, not her race.  Finally, any retaliation claim that Brown may be pursuing under the Rehabilitation Act or Title VII fails as a matter of law because no evidence suggests that Brown's complaints about discrimination caused her termination.  Therefore, the court will grant defendant's motion for summary judgment and direct entry of judgment in its favor.

## UNDISPUTED FACTS[2]

Plaintiff Laurette Brown began working as a project development engineer within the DOT in 2008, and she remained in that position until 2017 when she was terminated. During the relevant period, Ashley McGree served as the Human Resources Specialist – Senior and Medical Reasonable Accommodation Coordinator for the DOT.  Randy Sarver is a Human Resources Manager who worked as a human resources director for the DOT during the relevant time.  Daniel Okpala was the Project Development Chief and a mentor to Brown.  Brown's supervisor was Brenda Shoenfeld, a Project Development supervisor.

In February 2017, Brown had used approximately 40 hours of FMLA leave in January, and at that point, she had 392 FMLA hours remaining for that calendar year. Brown requested FMLA leave for a block of time between January 25, 2017, and April 1, 2017, due to a serious medical need.  Specifically, on April 1, 2017, Brown's doctor faxed

---

[2]  Unless otherwise indicated, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying record evidence as appropriate.

a form stating that Brown was experiencing an exacerbation of symptoms requiring intensive treatment and a continuous leave from work.  On April 28, her doctor indicated that Brown's condition was improving, and she could return to work on a reduced schedule starting May 1, 2017.  The doctor further wrote that Brown could work 12-15 hours per week, if those hours were spread over three to five days.  On June 5, 2017, McGree received another letter from Brown's doctor stating that she planned to increase the hours that Brown could work according to a schedule, and that Brown could work up to 36 hours a week indefinitely starting July 3, 2017.

Brown maintains that during this period she had a negative working relationship with her immediate supervisor, Schoenfeld.  In May, when Brown was working a reduced schedule, Schoenfeld told Brown that she needed to provide a three-day notice of any change to her schedule.  According to Brown this requirement did not apply to two of her co-workers.  Brown also claims that Schoenfeld pressured her to complete her work and on multiple occasions would linger by her desk and monitor her closely.  Brown further notes that during a project meeting Schoenfeld gave her negative, unproductive feedback.  Finally, in July of 2017, Brown started to believe that Schoenfeld began monitoring her computer use "in an inappropriate manner."

Brown filed a harassment and discrimination complaint with the DOT, and on June 12, 2017, Brown spoke with employment relations specialist Brenda Brewer, who was charged with investigating Brown's complaint to determine whether a formal investigation was necessary.  Brown explained that Schoenfeld held her to higher standards than other employees, told other employees not to work with her and enforced rules arbitrarily.  The

3

very next day, Schoenfeld sent Brown a letter, advising that her temporary light/alternative duty assignment was based on her physical restrictions.  The letter also explained that her work assignment was to remain in effective until: August 1, 2017; Brown was cleared of medical restrictions and able to return to full duty; Brown's work restrictions were modified, changed or made permanent; *or* another temporary alternate duty assignment was issued.

Brewer also spoke with Schoenfeld on July 6, asking numerous questions about how she monitored Brown in comparison with other employees.  Generally, Schoenfeld maintained that although Brown had problems arriving at work on time, she performed well overall despite having issues completing projects in a timely fashion.  (*See* Ex. 1018 (dkt. #19-3).)  Afterwards, Schoenfeld sent Brown an "updated" temporary light/alternative duty assignment letter dated July 10, extending that assignment until August 22. (Ex. 1007 (dkt. #20-7).)  At the time Schoenfeld wrote that letter, she did not know when Brown would be able to return to full duty.

On July 13, Brewer next interviewed Amy Coughlin, a project lead in Brown's department.  Brewer asked Coughlin about the allegation that Schoenfeld had directed her not to assist Brown with her work, and Coughlin denied receiving that directive.  Based on her conversations with Brown, Schoenfeld and Coughlin, Brewer found insufficient evidence that the actions Brown complained about were motivated by her membership in a category protected by the Wisconsin Fair Employment Act or Title VII of the Civil Rights Act of 1964 or due to her use of FMLA leave.  Thus, Brewer informed Brown that she

4

would not be conducting a formal investigation of her complaint, but that Brown could file an external complaint with the Wisconsin Equal Rights Division or the EEOC.

On August 31, McGree emailed Schoenfeld informing her of information received from Brown's doctor stating that she was unable to work before 10 a.m., and that she could work no more than 32 hours per week until she was reevaluated at her October 24 follow-up appointment.  McGree further asked Schoenfeld to ensure Brown did not work outside those restrictions.  Schoenfeld responded that it would be difficult to accommodate Brown's need to arrive after 10 a.m. because she needed to attend meetings, trainings or conferences typically scheduled earlier in the day.  Even though Schoenfeld stated that it was important for Brown to attend those meetings and trainings, Schoenfeld nevertheless agreed that Brown could report to work after 10 a.m. on days where those meetings were not scheduled.  Further, Schoenfeld identified a list of upcoming meetings that might present a hardship if Brown missed them, with the closest date being a September 26 meeting.

On September 8, Brown submitted a request for a leave of absence from September 11 through December 11, and she provided supporting documentation.  On September 21, McGree sent Brown a letter advising that she had exhausted her FMLA leave in April. McGree further explained that Brown may have protections under the ADA, the ADA Amendments Act, and the Wisconsin Fair Employment Act ("WFEA").  However, because Brown's request for a medical leave of absence *would* be granted in part as a temporary accommodation from September 11 to October 29, McGree also advised Brown that she needed to provide medical documentation following her October 24 medical appointment,

5

and if Brown intended to return early and needed accommodations, she would need to provide written notice.  McGree further wrote that she would be requesting Brown's treating health provider to complete a medical questionnaire closer to October 29 to help the DOT understand her ability to return to work with or without restrictions or accommodations.

On October 17, McGree sent Brown a letter for delivery to Nurse Practitioner Luanne Rosa, requesting her to review Brown's position description and complete a medical inquiry form to determine Brown's ability to return to her position on October 30. On October 27, McGree received the completed inquiry from NP Rosa, who indicated that Brown was unable to work at that time.  Rosa explained that Brown could not perform "any function requiring concentration" at that time.  (Ex. 1012 (dkt. #20-12) 3.)  Although Rosa noted that Brown would have appointments every four to six weeks, and that medication would improve Brown's ability to concentrate, Rosa did not estimate when Brown's condition might change or improve.

On November 7, 2017, McGree received a Justification of Undue Hardship questionnaire that Schoenfeld had completed about Brown.  Schoenfeld indicated that multiple important projects had been delayed, unfinished or would be finished at additional costs because of Brown's accommodations.  Schoenfeld further noted that a critical project assigned to Brown in May 2017 was not completed and needed to be outsourced at a projected cost of approximately $3,000, in addition to about 100 hour of internal staff time and costs associated with finding and working with the consultant. Schoenfeld also noted that Brown was one of three senior level engineers assigned to a state

highway development project with a completion target date in May 2018, and that Brown's continued absence would require reassignment to another team member and outsourcing that other team member's work to an outside consultant at a higher rate. Schoenfeld further noted that Brown's absence fatigued her colleagues who had to step in to work on her projects.

After Human Resource Manager Randy Sarver evaluated Schoenfeld's completed Justification, he sent Brown a letter dated November 15, 2017, notifying her that the DOT was considering a medical separation of her employment. (*See* Ex. 1015 (dkt. #21-1).) Sarver also summarized the issues with her attendance and asked Brown to provide by November 29, any additional information that would help the DOT determine how to proceed with her future employment status. However, Brown claims that she was unable to access Sarver's communications due to her leave of absence.

On November 29, McGree and Brewer spoke with Brown on the telephone and explained that Brown's employment with DOT was ending for medical reasons, effective December 1. Specifically, McGree and Brewer cited Brown's inability to perform all the essential functions of her job as a project development engineer, with or without a reasonable accommodation. Even so, they encouraged Brown to provide mitigating information about her ability to work. During that same conversation, Brown claims to have specifically asked McGree and Brown what they meant by "medical separation," but they provided no answer.

That day Brown also replied to Sarver's letter by sending an email to McGree, Brewer and Sarver on November 29. In it, Brown expressed her desire to succeed at the

DOT, but she experienced "biased decision-making, degradation, intimidation, targeting, excessive monitoring, hostility, discriminatory practices, and harassing techniques."  (Ex. 1000 (dkt. #19-1) at 2.)  Brown further stated that because of her work environment and deteriorating  health, she could not work full time in her current position.  Brown also included multiple questions about what other options she had and whether the separation would impact her insurance.  Brown did not provide any new information about her condition.  On December 1, the DOT sent Brown a letter statingthat her employment had been "separated" for medical reasons, effective December 1.

As of November 4, 2022, Brown was still collecting disability benefits due to her inability to work, and her medical provider has not cleared her to work in any full-time position.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If there is any genuine issue as to any material fact, the court cannot grant summary judgment.  *Id*.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.  Defendant seeks summary judgment on all of Brown's claims.

## I.  ADA and ADEA Claims

To begin, defendant is entitled to summary judgment as to Brown's ADA and ADEA claims on sovereign immunity grounds.  The State of Wisconsin is immune from a suit for monetary damages under the Eleventh Amendment, and its immunity extends to its agencies and arms, which includes the DOT.  *See Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 749 (7th Cir. 2005).  Although there are exceptions to this immunity, none apply here.

Specifically, Wisconsin has not waived its immunity under the ADA or ADEA.  Nor has Congress abrogated states' sovereign immunity for claims under either the ADEA or Title I of the ADA.  *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 91 (2000) (ADEA); *Gore v. Indiana Univ.*, 416 F.3d 590, 591-92 (7th Cir. 2005); *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001) (Title I of the ADA); *Erickson v. Bd. of Governors of State Colls. & Univs. for Ne Ill. Univ.*, 207 F.3d 945, 952 (7th Cir. 2000) (same).

Finally, Brown has not sued a state official in their official capacity seeking injunctive relief, nor does she argue in her opposition brief that she should be allowed to amend her complaint to sue a state official in that capacity.  Accordingly, the DOT is entitled to summary judgment on Brown's ADEA and ADA claims.

## II.  Rehabilitation Act claims

The court did not grant Brown leave to proceed on Rehabilitation Act claims, but the DOT correctly acknowledges that it is subject to such a claim and seeks judgment on the merits.  Because the DOT is correct that the court would have allowed Brown to amend

to include this claim, and because the legal standard of the Rehabilitation Act is substantially identical to the ADA, Brown has had an adequate opportunity respond. Accordingly, the court takes up the substance of this claim and finds that it fails as a matter of law as well.

A claim under § 504 of the Rehabilitation Act has four elements: (1) an individual with a disability; (2) who was otherwise qualified to participate; (3) but who was denied access solely by reason of disability; (4) in a program or activity receiving federal financial assistance. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671-72 (7th Cir. 2012); *see also Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022). The Rehabilitation Act permits claims based on failure to accommodate, applying the same standard applicable to the ADA to determine whether a violation has occurred, so the court refers to cases under both sets of statutes in evaluating this claim. *See McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) (citations omitted).

The DOT seeks summary judgment on Brown's failure to accommodate and discrimination claims because Brown as not a "qualified individual" under the Rehabilitation Act and because further accommodations would have created an undue hardship for the DOT. First, under the ADA, a "qualified individual" with a disability is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). To be a "qualified individual" an employee must "satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."; if he does, he must be able to "perform the essential functions of the

position . . . with or without reasonable accommodation" at the time she was fired. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285, 287 (7th Cir. 2015); *see also Whitaker v. Wis. Dept. of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017) (explaining that an "otherwise qualified" employee is one who "is capable of performing the 'essential functions' of the job with or without a reasonable accommodation").

Brown's failure to accommodate claim "brings with it a requirement that both the employer and the employee engage in a flexible 'interactive process' and make a 'good faith effort' to determine what accommodations are necessary." *Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019) (quoting *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016)). "[A]n accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) (quoting 29 C.F.R. pt. 1630 app. § 1630.2(o)). The employer does not have to provide any particular accommodation requested by an employee; rather, the employer may choose any reasonable accommodation "that effectively accommodates the disabled employee's limitations." *EEOC v. Sears Roebuck*, 417 F.3d 789, 802 (7th Cir. 2005) (internal citations omitted).

In *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017), the Seventh Circuit held that a long-term leave of absence was not a reasonable accommodation under the ADA because "an extended leave of absence does not give a disabled individual the means to work; it excuses his not working." *Id.* at 481. As a result,

the court held that "the inability to work for a multi-month period removes a person from the class protected by the ADA." *Id.*

The reasoning in *Severson* certainly appears to apply squarely to Brown's ADA claim as well. First, the record shows that DOT engaged in the interactive process to accommodate Brown's need for medical leave. Second, throughout 2017, Brown received modified hours, a reduced schedule, entry-level work and multiple periods of leave, well beyond that guaranteed by FMLA. Third, the last letter Brown's medical provider sent in October simply asked for additional leave for an indefinite duration, indicating that Brown was not medically able to work in *any* capacity for the foreseeable future. At that point, there is no indication that the DOT had a factual or legal basis to conclude that Brown, who had already been taking leave consistently throughout 2017, would be able to work, with or without a later start time or other reasonable accommodation.

Moreover, Sarver sent the November 15 letter, explaining that DOT was still considering a medical separation and explicitly asking for additional information that would assist in determining her future employment status. The record shows that Brewer and McGree also talked Brown through that letter and asked her explicitly for more information. Finally, although Brown raised general concerns about her working environment in the November 29 email, she did not provide *any* further information about her condition, much less a time frame for her return to work.

Brown does not respond substantively to this argument but instead focuses on her belief that defendant failed to explicitly ask her for more information from her medical provider in November of 2017. However, "[a]n employer may reasonably request medical

support to determine necessary accommodations and deny a request if the employee does not produce it." *Keen v. Merck Scharp & Dohme Corp.*, 819 F. App'x 423, 427 (7th Cir. 2020) (citing *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 821, 824 (7th Cir. 2017)). Brown does not deny having a telephone conversation about the November 15 letter or responding by email to the November 15 that had asked her to provide more information about how much time she might need before returning to work.  Nor does Brown suggest that she or her medical provider could have elaborated on her condition in a way that suggested Brown might be able to return to work in any capacity in the foreseeable future, or that other accommodations that would have allowed her to do so.  Considering the most up-to-date assessment of Brown, as of December 1, therefore, Brown was unable to perform the functions of her position with the DOT, with or without further accommodation.  At that point, Brown was not a qualified individual for purposes of the Rehabilitation Act and her claim fails for that reason alone.

Even assuming Brown was a qualified individual with a disability at the time of her termination, the DOT also asserts that as of December 1, further accommodations were not reasonable and placed an undue hardship on DOT.  "Under the ADA, an employer must make 'reasonable accommodations' to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an 'undue hardship.'" *Sears, Roebuck*, 417 F.3d at 802 (quoting 42 U.S.C. § 12112(b)(5)(A)).  A plaintiff must demonstrate that the accommodation sought is facially reasonable; then, the defendant has the burden to show an undue hardship or that the proposal is unreasonable.  *Kauffman v. Peterson Health Care VII, LLC,* 769 F.3d 958, 963 (7th Cir. 2014).  "An accommodation is reasonable if it

is both efficacious and proportional to the costs to implement it.  An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) (internal citations omitted). Accordingly, the employer's financial condition is one consideration in analyzing whether a reasonable accommodation would impose an undue hardship.  *Vande Zande v. State of Wis. Dept. of Admin*, 44 F.3d 538, 543 (7th Cir. 1995).  In particular, the employer must establish that "the costs are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health." *Id.*

Throughout 2017, as was its obligation, the record shows the DOT worked out multiple accommodations for Brown in accordance with her medical provider's restrictions. However, the record also shows that these restrictions became increasingly difficult and costly in the fall of 2017, when Brown requested a continuous three-month leave of absence from September 11 to December 11.  Indeed, the DOT submitted undisputed evidence of the costs associated with Brown's inability to work, essentially in any capacity, throughout 2017, including:

1. Brown was assigned a project in May 2017 that was not completed and needed to be outsourced, at the approximate cost of $3,120, in addition to the approximate 100 hours other staff spend on the project.

2. The state highway development project in which Brown was a part also required reassignment and outsourcing because of her multiple absences.

14

3. Brown was working on entry-level projects since her return to work in 2017, meaning she was working on projects usually assigned to someone below her level. This assignment pattern adversely impacted morale by fatiguing colleagues at her level, who had to take on more projects because of Brown's absences.

Brown does not dispute the impacts caused by her absences, but instead focuses on her belief that the DOT did not attempt to accommodate her in October of 2017, and that she was over-monitored by Schoenfeld. However, whether Brown was being monitored while she was working does not change the fact that the DOT attempted to work with Brown to find a workable schedule and accommodations for her to return to work. To the contrary, on the record provided by the parties on summary judgment, no reasonable jury could find that the DOT failed to make reasonable efforts to participate in the interactive process. As importantly, there is no dispute that Brown's continual absences cost DOT money and burdened Brown's colleagues.

Moreover, as of November 2017, the record shows that the DOT had no other choice but to reassign all of Brown's foreseeable duties and responsibilities, and "[t]o have another employee perform a positions' essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *See Majors v. General Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013) (citing *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir. 1996)). As a result, DOT provided all reasonable accommodations available, and Brown's final request for a continual leave of absence presented an undue hardship for the DOT. Accordingly, Brown's Rehabilitation Act claim fails as a matter of law, and the

15

court need not address DOT's final argument that the termination decision was not due to her disability.

## III.  Title VII Claim

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to refuse to hire, deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of "such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a).   Because the DOT has moved for summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence permitting "a reasonable factfinder to conclude" that the plaintiff's national origin "caused the discharge or other adverse employment action." *Johnson v. Advocate Health* & *Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

While a plaintiff is free to offer direct or circumstantial evidence of discrimination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).   Still, the "familiar" burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), allows "a plaintiff to make a *prima facie* case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (July 31, 2020).   To establish a prima facie case, a plaintiff must at least show:  (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action;

16

and (4) another, similarly-situated employee outside of his protected class received better treatment from his employer. *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020).

Here, Brown has not made out a prima facie case of discrimination. Much to the contrary, it is undisputed that Brown could not work due to her continuing need for medical leave, and Brown has not shown that any other DOT employee outside of her race, and with a similar attendance record, was treated more favorably than she. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (citation and quotation marks omitted). Brown has not submitted evidence of another employee outside her race with a similar attendance record who was not terminated from employment; instead, she would rely on general anecdotes about her own employment experience.

For example, in her opposition brief, Brown points out that Schoenfeld commented that she should come work for her to avoid becoming like another employee who "didn't do much work" and mainly walked around the halls and did "odd jobs." Brown generally claims that this other employee was white and not disciplined for his behavior, and further that Shoenfeld placed higher expectations on her. (*See* dkt. #28, at 1.) But Brown has submitted no admissible evidence about this other employee, much less whether Schoenfeld was that employee's supervisor or whether that employee had a similar record

of medical absences.  Thus, even if Brown meant to include this other employee as an example of a comparator, her proof falls woefully short.

In fairness, Brown also testified in her deposition that, like her, other employees had issues with project time lines, but also conceded that she did not follow up to determine whether Schoenfeld had taken steps to correct those employees' issues.  (*See* Brown Dep (dkt. #20) 22.)   Brown also questions Schoenfeld's rule requiring her to provide three days of notice for changes to her schedule, representing that no one else was subject to that rule, and provides an instance in which Schoenfeld improperly charged her with insubordination for tardiness and berated her about her performance.   Again, however, she has not provided specific comparisons between herself and these other employees with similar attendance records.

Finally, no evidence of record suggests that Brown was terminated *because* of her membership in a protected class nor that the DOT's reason for her termination was pretextual.  Although Brown argues that during her employment, she felt alienated, that people did not speak to her in passing and that there were questions about her hair and smell, these statements are also vague, unsupported by evidence of record, and unrelated to the reason for her termination.  Therefore, the DOT is entitled to summary judgment on Brown's Title VII discrimination claim as well.

## IV.   Retaliation

Finally, the DOT is entitled to summary judgment on Brown's retaliation claim.  To prevail on a retaliation claim under Title VII, a plaintiff must submit evidence that:  (1) she engaged in a statutorily protected activity; (2) the defendant took a materially adverse

action against her; and (3) there is a but-for causal connection between the adverse action and the protected activity. *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017 (citations omitted).  The causation element of Rehabilitation Act retaliation claims is more arduous, requiring the plaintiff to prove that their disability is the sole reason for the adverse action. *Connors v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021).

Under either standard, Brown's retaliation claim fails at the third element.  The record of the reason for Brown's termination is undisputed; Brown has not come forward with any evidence that her discrimination complaint, investigated over five months before her termination, contributed in any manner to her termination.  Instead, the only conclusion that a reasonable jury could draw from the evidence at summary judgment is that the October 2017 letter from Brown's medical provider, with no indication that she may be able to return to work in any capacity in the near future, was the driving force behind her termination.  Accordingly, the DOT is entitled to summary judgment on this claim as well, and the court will grant the DOT's summary judgment in full and direct entry of judgment in its favor.

ORDER

IT IS ORDERED that:

1.  Defendant's motion for summary judgment (dkt. #16) is GRANTED.

2.  Plaintiff's motion for summary judgment (dkt. #27) is DENIED.

3.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 8th day of May, 2023.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge